# 14-2916-CV

*To be Argued by:*
HAROLD F. MCGUIRE, JR.

## United States Court of Appeals

*for the*

## Second Circuit

BARNEY J. NG, as the Sole Trustee of the Barney J. Ng Living Trust,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

STEPHEN SCHRAM,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLEE

HAROLD F. MCGUIRE, JR.
DANIEL F. MCGUIRE
D.F. MCGUIRE & ASSOCIATES, LLC
777 Westchester Avenue, Suite 101
White Plains, New York 10604
(914) 368-0016

*Attorneys for Defendant-Counter-Claimant-Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

Statement of the Issues ..................................................................1

Statement of the Case ....................................................................1

    1.    Nature of the Case .............................................................1

    2.    Course of Proceedings Below .............................................2

Statement of Facts .........................................................................5

    1.    Background of the Litigation – Snake River's Insolvency ...................5

    2.    Ng Decides to Separate Promoter Edgcomb from Snake River; He Meets with Schram and Congleton and Proposes a Temporary Guarantee ...................................................8

    3.    The Separation Agreement ................................................12

    4.    Edgcomb is Persuaded. .....................................................14

    5.    Ng Makes a Written Offer to Release Schram ...................15

    6.    Schram Signs the Guarantee, Constituting his Acceptance ...............17

    7.    The Release is Triggered, but Ng Does Not Perform .........19

Summary of Argument...................................................................20

ARGUMENT ...............................................................................21

    POINT

    THE CASE WAS PROPERLY SUBMITTED TO THE JURY, AND THE JURY'S FINDINGS ON THE CRITICAL ISSUES SHOULD NOT BE DISTURBED ...............................................21

    a.    Standard of Review .........................................................21

    b.    The Jury was Properly Charged on the Parol Evidence Rule and was Correctly Permitted to Determine whether the Release Agreement was Separate and Not Inconsistent with the Guarantee ................................................................24

i

c.   The Application of Wyoming's Parol Evidence Rule ........................30

Conclusion ................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Applied Genetics v. First Affiliated Securities,*
   912 F.2d 1238 (10th Cir. 1990) ...................................................26

*Belden v. Thorkildsen,*
   156 P.3d 320 (Wyo. 2007)...........................................25, 32, 33, 34

*Bushnell v. Elkins,*
   245 P. 304 (Wyo. 1926)...............................................................30

*Cameron v. City of New York,*
   598 F.3d 50 (2d Cir. 2010) ...........................................................22

*Gem Corrugated Box Corp. v. National Kraft Container Corp.,*
   427 F.2d 499 (2d Cir. 1970) .......................................................... 27

*Lefforge v. Rogers,*
   419 P.2d 625 (Wyo. 1966).............................................................36

*Lore v. City of Syracuse,*
   670 F.3d 127 (2d Cir. 2012) ..........................................................23

*Manley v. AmBase Corp.,*
   337 F.3d 237 (2d Cir. 2003) ..........................................................22

*Merritt v. AMS Anlangenplanung Gmbh & Co.,*
   8 Fed. App'x 54 (2d Cir. 2001) ......................................................24

*Mitchill v. Lath,*
   247 N.Y. 377 (1928) ..................................................................... 27

*New York v. Pullman Inc.,*
   662 F.2d 910 (2d Cir. 1981), *cert. denied,* 454 U.S. 1164,
   102 S. Ct. 1038, 71 L. Ed. 2d 320 (1982).......................................23

*North American Uranium v. Johnston,*
   77 Wyo. 332, 316 P.2d 325 (1957) ............................................... 26

*Western National Bank of Lovell v. Moncur,*
   624 P.2d 765 (Wyo. 1981).............................................................. 26

*Wright v. Krouskop,*
   108 P.2d 262 (Wyo. 1940)..............................................................35

iii

**Statutes & Other Authorities:**

17 Am. Jur. 2d, *Contracts* § 262 ............................................................................ 26

22 N.Y. Jur. 2d, Evidence § 629 .......................................................................... 27

*Restatement (Second) Contracts* § 50(2) (1981) ..................................................21

*Williston on Contracts* § 6:2 (4th Ed. updated May 2014) ....................................21

*Williston on Contracts* § 33:2 (3) (4th Ed. updated May 2014) .............................31

*Williston on Contracts, Parol Evidence Rule,* §§ 33:1-33:4
(4th Ed. updated May 2014) .........................................................................31

**Statement of the Issues**

Defendant Schram signed a document containing a one-sentence guarantee of approximately $70 million of the obligations of an insolvent corporation, including a $5 million note to plaintiff Ng. Was District Judge Abrams correct under Wyoming law in permitting the jury to determine that an explicitly "separate" contemporaneous side agreement was formed, through a written offer from Ng and Schram's performance in reliance thereon, providing that Ng would release Schram from his guarantee in the near future under defined circumstances?

**Statement of the Case**

*1. Nature of the Case*

Ng represented the mortgage lender to a failing Wyoming resort development. In 2004 Ng obtained a $5 million note from the resort as a commission for his services in arranging a $64 million mortgage loan facility with that lender. In late 2007 the resort was in a state of "insolvency" (Ng's word). Even so, Ng persuaded Schram, whose company managed the resort, to sign a "temporary" guarantee of the resort's debt (both to the mortgage lender and to Ng himself) by making the explicit promise to Schram: "Will never enforce." Ng further

1

promised *in writing* that "the lenders … will release Steve Schram's personal guarantee" when another party made a land purchase payment in a relatively small amount that would reduce the balance owed to the mortgage lender – a payment that was anticipated within a short time. In reliance on that promise, Schram signed the guarantee. The land purchase payment was made soon thereafter as anticipated, but Ng did not release the guarantee as he had promised in writing, and he eventually brought this diversity action in late 2010 to attempt to enforce it (Complaint, A-16).

## 2. *Course of Proceedings Below*

Schram's answer to the complaint contained defenses based on the facts summarized above. Schram also counterclaimed for breach of the release agreement (A-50, 54-55). Ng moved to dismiss Schram's counterclaim, based primarily on his contention that any evidence of the release agreement was barred by the parol evidence rule. Schram submitted an affidavit in opposition explaining the circumstances of the release agreement (D.C. Dkt. No. 9, *see* A-6). Judge Griesa converted Ng's motion into a motion for summary judgment and denied it because there were unresolved factual issues, allowing the counterclaim to stand. (D.C. Dkt. No. 11, *see* A-6).

After the close of discovery, Ng moved once again for summary judgment based largely on the parol evidence rule. Schram cross-moved for summary judgment, contending primarily that he had received no consideration for his $70 million guarantee. Judge Abrams applied Wyoming law and denied both motions with a thorough 21-page opinion. (A-56-76) The District Court ruled that the guarantee was valid and enforceable despite the fact that the consideration was minimal and flowed to a third party (the resort) and not Schram. However, she held that the "enforceability [of the guarantee] against Schram might be subject to the Release Agreement, if the jury finds that one was formed." (A-74) Under Wyoming law, the District Court held, the parol evidence rule does not create a bar

> if the evidence is used to establish a separate and distinct contract [from the written agreement] … "even though it relates to the same general subject matter and grows out of the same transaction, if it is not inconsistent with the writing." (A-74-75) (Internal citation omitted.)

Ng made pre-trial motions *in limine* to exclude essentially all of Schram's trial evidence on the basis of the parol evidence rule (*see* D.C. Dkt. Nos. 54-56, A-9). Judge Abrams denied those motions from the bench in almost all respects (A-77-80). A jury heard evidence over three days from three witnesses: Ng, Schram, and Schram's former chief

financial officer. The evidence dealt with the circumstances under which the release agreement was made and its conditions met. Judge Abrams repeatedly instructed the jury that none of Schram's evidence could be considered with respect to the validity or enforceability of the guarantee, but that it was being admitted only so that they could determine whether Ng had made a separate side agreement to release Schram. (*E.g.,* A-141, A-186, A-213) At the close of the evidence, Judge Abrams denied Ng's motion for a directed verdict based on the parol evidence rule. (A-200) She charged the jury on the Wyoming parol evidence rule as Ng had requested (Tr. 701-02, A-215-16)[1] and on the law of contract formation with respect to the release agreement – *i.e.,* the elements of offer, acceptance and consideration (A-216-17). After a short deliberation the jury unanimously found that Schram had proven a "separate and distinct" release agreement between Ng and himself that was "not inconsistent" with the guarantee, and that Ng had breached it by pursuing the guarantee. They returned a verdict in Schram's favor, answering four questions in the affirmative (A-234-35). The District Court entered

---

[1] Transcript sections are reproduced in the Joint Appendix with four transcript pages to each page of the Joint Appendix. References in the form "____Tr. ___" are to the named witness's trial testimony, by transcript page number, followed by a reference to the Joint Appendix in the form "A-___".

judgment accordingly, awarding Schram nominal damages of $1.00 on his counterclaim. (A-227)  Ng made a post-trial motion for judgment as a matter of law and for a new trial, again based primarily on the parol evidence rule.  Judge Abrams denied that motion with a short opinion. (A-229-32)  Ng bases this appeal entirely on the supposed applicability of the Wyoming parol evidence rule to the release agreement that the jury found the parties formed.

## Statement of Facts

### 1. Background of the Litigation – Snake River's Insolvency.

Richard Edgcomb, through a wholly owned entity named CCI, was the original promoter of the Canyon Club resort development in Jackson Hole, Wyoming. (Stipulation No. 1, A-81)  That project went into bankruptcy in 2003 and emerged in 2004 with the aid of a mortgage loan facility from a family company named R.E. Loans, of which Ng (a son of the founder) was a representative. (Stipulation No, 2, A-81; Ng Tr. 121, A-82; Ng Tr. 199-201, A-137-38) In the reorganization Edgcomb's entity CCI became the 80% majority owner of a new company, Snake River Sporting Club, LLC, ("Snake River"), which took over the ownership and development of the resort property in late 2004 and gave a $45

million subordinated note to CCI. (Congleton Tr. 282-84, A-153-54; Stipulations No. 4 and 5, A-81)

R.E. Loans provided the principal mortgage financing for Snake River in the total committed amount of over $64 million. (Stipulations Nos., 2 and 3, A-81; Congleton Tr. 284, A-154) CCI also gave Ng's company Bar-K a deferred $9 million commission, in the form of a subordinated second note, for arranging that mortgage financing. (Stipulations Nos. 6-8, A-81) $5 million of that second note was eventually assigned to Ng's personal trust. (Stipulation No. 9, A-81) Various Edgcomb entities, as well as Snake River, were obligors on the two notes.

Schram was an experienced and successful resort developer. He was a principal in a company known as DPS, which began in late 2004 to manage the Snake River project, compensated solely by sales commissions. (Schram Tr. 465-66, A-181; Ng Tr. 201, A-138; Congleton Tr. 286, A-154) Neither DPS nor Schram had any liability under the $64 million mortgage note or the subordinated second note. (A-25-31; A-81) A subsidiary of DPS obtained a "sweat equity" minority equity interest in Snake River that would have value only if the resort became successful and after approximately $119 million in loans were paid to R.E. Loans,

6

Ng and Edgcomb. (Congleton Tr. 286-87, A-154-55; Schram Tr. 472-74, A-182-83).

By mid-2007 Snake River was again in serious financial trouble. It was unable to pay the 12% annual interest (roughly $600,000 per month) on its mortgage loan from R.E. Loans (Ng Tr. 202-06, A-138-39). Resort property sales were at a standstill, and -- as Ng wrote in his own handwriting (Ex. 102, A-176), Snake River was in a state of "insolvency" and required at least a $20 million capital infusion (Ng Tr. 208, A-139; Schram Tr. 477-79, A-183-84). As Ng testified, the equity in the project had no value:

> Q. So we're talking about something in excess of $120 million that had to be paid down before the equity ownership of this project was worth a dime?
>
> A. It would be under $120 million, but close to $120 million, yes.
>
> Q. All right. As the project stood in mid-2007, would you have paid a dime for that hundred percent equity interest?
>
> A. With that amount of debt, I would probably not be willing to pay for that property.
>
> Q. Okay. And, in fact, you were offered the opportunity to take that for free, and you refused, right?
>
> A. RE Loans is a lender. It is not in the position of owning property. So it was not a consideration under the circumstances. (Ng Tr. 231-32, A-144-45)

### 2. Ng Decides to Separate Promoter Edgcomb from Snake River; He Meets with Schram and Congleton and Proposes a Temporary Guarantee.

Things were not likely to improve so long as Edgcomb remained in the picture as promoter and majority owner of the project, since (as Ng told Schram and Congleton) Edgcomb's "presence and involvement was a negative for the project" because he had a "negative local reputation" and an "image problem" (Congleton Tr. 295, 298, A-155-56; Congleton Tr. 317, A-158; *see* Ng Tr. 262-63, A-151, Schram Tr. 484-85, A-185) Thus, Snake River's lender (represented by Ng) was anxious to get promoter Edgcomb out of the project unless he was prepared to provide additional capital. Edgcomb made it clear he would not do any such thing. (Ex.101, A-212; Ex. 104, A-177; Ng Tr. 213, A-140)

In mid-November 2007 Ng met with Schram and his chief financial officer Tyler Congleton, and outlined to them the "dire" impact of letting Snake River default on the principal mortgage note. (Ng Tr. 221-22, A-142; Congleton Tr. 300-01, A-156-57) Ng pointed out that insolvency proceedings might take over a year -- in large part because of the potential difficulties Edgcomb could cause if bankruptcy ensued. (*See* Ng Tr. 254, A-149) During that time the resort project would be stalled. Instead, Ng proposed a "Plan B," in which Edgcomb and all his interests

would be separated from Snake River. (Congleton Tr. 296-97, A-155-56) The contemporaneous notes of that meeting, partly in Ng's handwriting and partly in Congleton's, were received in evidence. (Exhibit 102, A-176)  In order to accomplish Ng's objective to "divorce" Snake River from Edgcomb, Ng proposed that Schram become a party to the proposed Separation Agreement and provide a personal guarantee of the two mortgage notes owned by R.E. Loans and Ng himself.  In Ng's words (as recorded by Congleton) this was to be a "temporary step – Will never enforce only until Dick [Edgcomb] is out, then refinance with REL [R.E. Loans], then find new investor or capital." (*Id.;* Congleton Tr. 315-22, A-158-59)  Schram's guarantee, according to Ng, would persuade Edgcomb to go through with the Separation Agreement.  However – and this is of critical importance – from the beginning (and repeatedly) Ng represented to Schram that this was a "temporary step" and that he would "never" enforce the guarantee.   (*Id.*; Congleton Tr. 296-97, A-155-56; Congleton Tr. 321, A-159; Schram Tr. 487, A-186.)  "And we'll have some sort of a, you know, trigger immediately, you know, after the separation to release it." (Congleton Tr. 319, A-159)  Ng never even asked Schram what his financial circumstances were. (Ng. Tr. 234, A-145; Schram Tr. 491, A-187)

Ng's design was that Edgcomb would be informed about the guarantee but not the release mechanism – presumably to persuade Edgcomb (falsely) that Schram would supply financing for the project that Edgcomb could not or would not provide. As Schram testified,

> A.   Yes.   He did not want Dick to know about it.   He wanted this to be an agreement between himself and myself.   He felt that if Dick knew there was a guarantee, that that could somehow affect getting the separation agreement signed.
>
> Q.   Is that what he told you?
>
> A.   Yes.
>
> Q.   Then and there at that dinner meeting.
>
> A.   Correct.
>
> * * * *
>
> A. Right.  It was important to have a guarantee.  It was the release mechanism which made it a temporary guarantee.  But he [Ng] felt if Dick was aware of that, he would not sign the separation agreement.
>
> Q. Did he say why?
>
> A. He thought Dick wanted something – he wanted more security for, you know, signing the separation agreement.  (Schram Tr. 492-93, A-187)

Ng said he would not require any of the legal formalities, terms and conditions that normally attended a guarantee of this size. (Schram Tr. 491-92, A-187)

Understandably, Schram was at first unwilling to provide the guarantee (Schram Tr. 488, A-186; Congleton Tr. 297-98, A-156). Neither Schram nor his company had invested any cash in the project. As Ng testified (Ng Tr. 213-214, A- 140 – A-141):

> Q. Now you knew at that point that Schram and Congleton and their entity DPS didn't have any cash investment in this project, correct?
>
> A. That is correct.

Under those circumstances, it would be hard to fathom a reason why Schram would put himself personally and irrevocably on the hook for nearly $70 million owed by an insolvent corporation whose equity was worthless.

> A. I said, Barney, why would I do that? Why would I put my life, my kids' life, everything that I have worked so hard for for a personal guarantee of $70 million? I don't have that kind of money. (Schram Tr. 487, A-186)

On the other hand, the lender R.E. Loans, which Ng represented, was the proverbial 600-pound gorilla.

> [I]t was really Barney who was in control of the situation. You were in a project where we were not making any money, we were just about to miss interest payment. The person who owns the debt or holds the debt in these situations really begins to control the entire project. (Schram Tr. 485-86, A-185)

Ultimately, Schram felt it necessary to accede to Ng's wishes. "I considered Barney a friend and a partner." (Schram Tr. 488, A-186)

11

"When he [Ng] asks you a favor or asks you to do something, you have to consider it very seriously, not to mention we wanted the project to be successful." (Schram Tr. 489-90, A-186)

### 3. The Separation Agreement

The Separation Agreement, as its name implied, was to be largely concerned with the terms of the Edgcomb "divorce." The principal contracting parties were to be Edgcomb, his wife and entities he owned, on the one hand, and Snake River (controlled in practice by R.E. Loans) on the other. Edgcomb wanted to obtain title to two building lots, Nos. 13 and 19, and the agreement would permit that to occur. He had pledged 144 acres of land he owned as additional collateral for Snake River's indebtedness, and that collateral would be released. Edgcomb would need to give up his $45 million note from Snake River and his 80% equity in the project, both of which were worthless. Edgcomb needed to provide easements on land he owned to allow access to the resort. (Exhibit 7, A-172)

Schram's potential personal liability on the proposed guarantee was grossly out of proportion to any possible reward Schram or his company might reap from sales commissions even if the project were to succeed – and, as noted, Schram did not have any debt or equity money

at risk.  Ng, representing the lender, understood that fully.  Asked why Schram would agree to put his signature on the Separation Agreement, Ng could only say, "I cannot speculate." (Ng Deposition Tr. 129-30)[2] While everyone hoped that the Snake River development could be turned around, this was a long shot at best. The project's current financing was not equal to its needs.  Efforts to find new financing had been unavailing. The market was in decline. The principal mortgage loan was in arrears. Snake River was losing money rapidly, and sales of property in the resort had been languishing for years. (Congleton Tr. 285-86, A-154).

The guarantee was Schram's only connection to the proposed Separation Agreement, and Ng insisted on it, while repeatedly saying it would never be enforced.  (Congleton Tr. 318-19, A-159; Schram Tr. 497, A-188). To accomplish this, Schram and Ng had oral discussions concerning the trigger mechanism that would be used to release or, in Ng's words "satisfy the guarantee."  (Ng Tr.258, A-150; Congleton Tr. 319, A-159)  As Schram testified,

> A. Well, the discussion was that there would be a mechanism created that as soon as Dick bought his two lots, that the guarantee would then go away.

---

[2] This videotaped deposition testimony was received in evidence (Tr. 458) but the court reporter did not transcribe the question and answer, recording only "(Videotape played)"

Q. This was all Mr. Ng's idea?

A. Correct. Why would I propose that I would put $70 million worth of guarantee on that? That didn't make any sense.

Q. Did Mr. Ng say in words or substance that this would only be temporary?

A. Yes. He said this is a situation where as soon as we get Dick out and it will probably be four to six weeks and then you will be released from the – as soon as Dick pays for the lots, you will be released from the guarantee. (Schram Tr. 490, A-186)

So Schram said he would think about it. (Schram Tr. 501, A-189)

He later told Ng he would sign the guarantee, but "Only under those conditions." (*Id.*)

### 4. Edgcomb is Persuaded.

Shortly afterwards, Ng called a meeting. Schram attended, along with Congleton, Edgcomb and Edgcomb's lawyer. Ng explained the terms of the proposed Separation Agreement, including the guarantee, but not the release mechanism that had been discussed. (Congleton Tr. 324-26, A-160) Ng warned Edgcomb about how a Snake River bankruptcy could harm him: it could cause a foreclosure on the 144 acres of separate property that Edgcomb owned and had pledged as additional security on the Snake River mortgages. Ng told Edgcomb that the mortgage lenders would release the liens on the 144 acres and that Snake River would sell him the two building lots (Lots 13 and 19) for a bargain price if Edgcomb

14

would give up his 80% equity interest in Snake River and cancel the $45 million promissory note from Snake River that his wholly-owned company CCI held. (Ng Tr. 237-38, A-146)  Both the equity and the $45 million note were actually worthless because of the "dire" financial straits of the project. (Ng Tr. 244-45, A-148.)  Ng told Edgcomb at that meeting that Schram would guarantee the Snake River debt. (Ng Tr. 241, A-147)  Schram nodded in agreement. (Congleton Tr. 326, A-160; Schram Tr. 502, A-189)  The proposed release arrangement was not mentioned.

After that, the parties began drafting definitive documents.

### 5.  Ng Makes a Written Offer to Release Schram.

Congleton, after consulting with Schram, deliberately did not include the proposed guarantee in his "deal points" outline for the Separation Agreement (Exhibit 7, A-172; Congleton Tr. 330-33, A-161-62; Schram Tr. 504, A-189).  Schram testified this was because he "still wasn't completely clear" on the subject. (*Id.*)  Ng, however, made it clear that the guarantee was necessary.  On November 16, 2007 (at 4:02 AM), Ng responded to Congleton's draft by sending an e-mail addressed to Congleton and Schram's lawyers, with copies to Schram and Ng's own lawyer, Dennis Zentil.  Edgcomb and his lawyer were not included

because Ng and Schram "had a private understanding … about the release of the guarantee," which Ng did not wish to reveal to Edgcomb. (Ng Tr. 255-56, A-149): "[I]f I presented this to Mr. Edgcomb, it may have caused him to blow up or whatever you want to say and affect the ongoing negotiations." (Ng Tr. 259, A-150)

In his e-mail to Congleton (Exhibit 16, A-201), Ng insisted on the guarantee but proposed a "separate agreement" with Schram to release him from it in the near future. This was the "trigger" that had been discussed earlier. As noted above, Edgcomb (through an entity which he owned) wanted to take ownership of two building lots within the resort development (Lots 13 and 19). To obtain those lots it was necessary for Edgcomb to pay down the resort's principal mortgage note to the extent of $1.82 million (Ng Tr. 236, A-146), approximately half the face price of the lots (Ng Tr. 205, A-139). Ng's e-mail specified that when Edgcomb made his $1.82 million payment on those building lots, Schram would be released from his guarantee – which, of course, Ng had already promised would never be enforced in any event. (Congleton Tr. 321, A-159; Ex. 102, A-176).

In relevant part, Ng's critical e-mail contained the following language in connection with the draft Separation Agreement that was then being prepared:

> Steve Schram will personally guarantee the existing loans of RE Loans and Barney Ng. ( by *Separate* [*sic*] agreement between the lenders and Steve Schram a *further* agreement will release Steve Schram's personal guarantee if $1,820,000.00 in principal is paid down on lots 13 and 19 within 2 years of this agreement). If this is unacceptable to Steve, please contact me to discuss.
>
> \* \* \*
>
> [A] universal agreement … identifies the terms of the overall agreement to everyone (*except for the separate agreement between Steve Schram and the lenders*). I think this is important due to the nature in which this agreement was negotiated.
>
> I reiterate that time is of the essence. … It is imperative to realize that there is a default in existence presently and Dick Edgecomb [*sic*] has a history of changing his mind. (*Emphasis added*.)
> (Ex. 16, A-201)

## 6. Schram Signs the Guarantee, Constituting his Acceptance.

Ng's *written* offer of a "separate" and "further" release agreement, contained in that e-mail, was good enough for Schram. He did nothing further: "[M]y understanding, this was the separate agreement." (Schram Tr. 507, A-190) Ng's written offer promised that "the lenders" would

17

release the guarantee under the specified conditions.  There was no further negotiation of the point -- and, as the jury found despite contrary argument by Ng's counsel, Ng never withdrew his written offer.

Two and a half weeks later, without further negotiation, Schram signed the Separation Agreement, which contained a one-sentence guarantee of the notes payable to R.E. Loans and Ng.  In full, it read: "Stephen C. Schram ("Schram") irrevocably agrees to guarantee full payment of the Note and Second Note according to their terms."  (Ex. 2, paragraph 8, A-91)  By virtue of that action (as the jury found), Schram accepted Ng's November 16 offer of the release agreement and  "a contract [was formed] whereby Plaintiff Barney Ng agreed to release Mr. Schram from the guarantee provision of the Separation Agreement if certain conditions were met."  (Special Verdict Form, Court Exhibit 4, A-234)

The substance of the release agreement was, therefore, that in consideration for Edgcomb making a payment of $1.82 million on Snake River's principal mortgage note in connection with his land purchase, Ng would have R.E. Loans release Schram from his obligation to guarantee the $64.7 million principal mortgage note, and Ng himself would release Schram with respect to the separate $5 million second note that he held in

his personal trust. (Ex. 9, A-201; Congleton Tr. 334-35, A-162-63) The numerical discrepancy between $1.82 million (paid by a third party) and the cancellation of Schram's supposed $69.7 million obligations was powerful corroborative evidence enabling a reasonable jury to find that the parties always intended Schram's $70 million guarantee to be just a "temporary step … Will never enforce only until Dick is out." (Ex. 102, A-176)[3] Once Edgcomb had paid for his two building lots, his divorce from the project would be complete -- and (as agreed) Schram would not have any further personal exposure under that guarantee even in the very foreseeable event that additional capital could not be raised for the resort. If that occurred, of course, the development would fail and Snake River would not be able to pay the two notes to R.E. Loans and Ng.

### 7.  The Release is Triggered, but Ng Does Not Perform.

On January 23, 2008, approximately six weeks after the Separation Agreement was signed, Edgcomb caused the payment of $1,820,000 to

---

[3] The payment of the $1.82 million by Edgcomb, a third party, had no monetary relationship at all to the approximately $70 million in guarantees that were being released.  Edgcomb's payment served as a purely artificial and disproportionate triggering device – lending strong circumstantial support to Schram's testimony that Ng repeatedly promised him from the beginning that the guarantee would never be enforced and that it would be satisfied once Edgcomb was out of the Snake River project.

R.E. Loans and received a deed for Lots 13 and 19 in return. (Stipulation No. 14, A-81; Congleton Tr. 336, A-163) That severed his last connection with Snake River.

In March 2008, Ng confirmed to Snake River's auditors that there was no guarantee. (Congleton Tr. 338-40, A-163-64)

Approximately nine months later, Snake River, unable to sell resort property or raise additional funding in the environment of the real estate crash, *see* Ng Tr. 274-75, A-153; Schram Tr. 581-83, A-197-98, went into bankruptcy.

In late 2010, Ng sued to enforce the guarantee.

### Summary of Argument

The case was properly submitted to the jury under Wyoming law.[4]

The trial court was correct in not applying Wyoming's common-law parol evidence rule to bar all evidence of the release agreement, which Ng's brief repeatedly and erroneously refers to as an "oral agreement" (Ng Br. 16) and as "non-written" (*id.,* 16, 19*,*). The release agreement (as described in Ex. 9, Ng's e-mail of November 16, 2007) was not a *modification* of the Separation Agreement at all, but rather an

---

[4] There is no dispute that Wyoming law governs – but not, as Ng asserts, because of a choice of law provision in the Separation Agreement. All the relevant contacts were in Wyoming.

explicitly and intentionally "separate" simultaneous and collateral agreement between "the lenders" and Schram, to which Edgcomb was deliberately not made a party. The release agreement was *by its terms* conceived and offered as a supplemental side agreement, not as an alteration of the guarantee language in the written Separation Agreement. Wyoming's parol evidence rule permits extrinsic evidence of such a simultaneous collateral agreement. Moreover, its essential components were not "oral," but were embodied in Ng's *written* e-mail offer of November 16, 2007 (Ex. 9, A-105) and Schram's acceptance by his *actions* in reliance.[5]

## ARGUMENT

### POINT

### THE CASE WAS PROPERLY SUBMITTED TO THE JURY, AND THE JURY'S FINDINGS ON THE CRITICAL ISSUES SHOULD NOT BE DISTURBED

#### a. Standard of Review

Any claim of error in the District Court's admission of evidence about the release agreement is reviewable under an abuse of discretion standard, as Ng acknowledges, Br. at 20. "'We review a district court's

---

[5] When an offer is accepted by performance the contract is sometimes called a unilateral contract. *Williston on Contracts* § 6:2 (4th Ed. Updated May 2014); *compare, Restatement (Second) Contracts* § 50(2) (1981).

evidentiary rulings for abuse of discretion, and will reverse only for manifest error.' *Manley v. AmBase Corp.,* 337 F.3d 237, 247 (2d Cir. 2003) (citations omitted).  We afford district courts 'wide latitude ... in determining whether evidence is admissible, and in controlling the mode and order of its presentation to promote the effective ascertainment of the truth.'" *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).

Ng contends (Br. at 19) that "the District Court based its decision [to submit the case to the jury] on *its legal determination* that the non-written release agreement was a separate agreement from the underlying written Guarantee Agreement." (Emphasis added) This is simply not so. In fact, rather than making such a "legal determination," the District Court *submitted to the jury* the factual issues of whether the release agreement was separate from, and consistent with, the written agreement. (Tr. 701-02, A-215-16) [6].  Properly framed, therefore, the issue is whether the jury was adequately instructed.

In denying Ng's pre-trial summary judgment motion, the District Court ruled as a matter of law that the Wyoming parol evidence rule permits the use of evidence

---

[6] The cited transcript pages are headed "Mr. H. McGuire – summation," but this is an erroneous label.  The jury charge begins at Tr. 691, as the Record reflects.

22

to establish a separate and distinct contract [from the written agreement] … "even though it relates to the same general subject matter and grows out of the same transaction, if it is not inconsistent with the writing."  (A-74-75) (Internal citation omitted.)

The District Court adhered to that legal determination throughout the remaining proceedings and embodied it in the charge.  The standard of review is whether there was prejudicial error:

> "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 153 (2d Cir.1997) ("*Perry*") (internal quotation marks omitted). "[A] jury instruction will be deemed adequate if the charge ... is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Schermerhorn v. Local 100, Transport Workers Union of America,* 91 F.3d 316, 322 (2d Cir. 1996) (internal quotation marks omitted).

> "We review a claim of error in the district court's jury instructions *de novo,* and will reverse on this basis only if the appellant can show that the error was prejudicial in light of the charge as a whole." *Perry,* 115 F.3d at 153. … If the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner, they do not warrant reversal.

*Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012). *Also see, e.g., New York v. Pullman Inc.,* 662 F.2d 910, 917 (2d Cir. 1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

If properly instructed, the jury's decision on the underlying factual issues cannot be overturned unless this Court finds that no reasonable jury

could have found (in the words of the charge) a "separate and distinct agreement" that was "not inconsistent" with the guarantee. "We will reverse only if the evidence, drawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in her favor." *Merritt v AMS Anlangenplanung Gmbh & Co.*, 8 Fed. App'x 54, 57 (2d Cir. 2001).

### b. The Jury was Properly Charged on the Parol Evidence Rule and was Correctly Permitted to Determine whether the Release Agreement was Separate and Not Inconsistent with the Guarantee.

The terms of the release agreement were that Ng would "release Steve Schram's personal guarantee" when Edgcomb paid $1.82 million for his two lots. (Ex. 9, A-105)  That payment was duly made, so the release of the guarantee was thereupon required, as the jury found. The release agreement did not in any sense alter or contradict the guarantee, but rather explicitly recognized it and provided a means for its *satisfaction* -- a distinction that Ng himself made in his testimony (Ng Tr. 258, A-150).  The release agreement was deliberately made ancillary to the complex, multi-party Separation Agreement and was *purposely not incorporated within it*, as Ng's e-mail of November 16, 2007 (Exhibit 9,

24

A-105) made clear. According to Ng himself, the reason was that Edgcomb (the principal focus of the Separation Agreement) was deliberately kept in the dark about the release arrangement. Ng made the reasons plain to both Schram and Congleton.

As the District Court repeatedly ruled, Wyoming law clearly recognizes the principle that such a separate agreement is exempt from the parol evidence rule. *Belden v. Thorkildsen*, 156 P.3d 320, 324 (Wyo. 2007) ("[W]e depart from the parol evidence rule if the evidence is used to establish *a separate and distinct contract*, a condition precedent, fraud, mistake, or repudiation.") (Emphasis supplied). Thus, parol evidence of the release agreement – a side agreement that did not involve the same parties as the Separation Agreement and had a related but different subject matter – was properly admitted.

The jury charge faithfully followed Wyoming law in committing to the jury the factual questions of separateness and consistency:

> [Y]ou can consider this evidence [of the release agreement] to determine whether a contract *separate and distinct from and independent of* the guarantee was created even if it relates to the same subject matter and grows out of the same transaction as long as it is *not inconsistent with* the guarantee. (Emphasis added.)

(Jury Charge, Tr. 701-02, A-215-16) By its verdict in Schram's favor,

25

the jury necessarily found that the release agreement was "separate and distinct from" and "not inconsistent with" the guarantee, as all the evidence indicated.

The "collateral contract" doctrine has solid roots in Wyoming case law. *E.g., Applied Genetics v. First Affiliated Securities,* 912 F.2d 1238, 1245 (10th Cir. 1990); *Western National Bank of Lovell v. Moncur*, 624 P.2d 765, 770-71 (Wyo. 1981): "[U]nder the prevailing view, the parol evidence rule does not affect a purely collateral contract distinct from, and independent of, the written agreement, even though it relates to the same general subject matter and grows out of the same transaction, if it is not inconsistent with the writing." (*Quoting* 17 Am. Jur. 2d, *Contracts* § 262); *North American Uranium v. Johnston*, 77 Wyo. 332, 352-53, 316 P.2d 325, 332-33 (1957): "The test is whether or not the parol testimony tends to show a *collateral agreement*, independent fact, condition precedent, or *other agreement* which is not inconsistent with, or does not qualify any of the terms of the written contract." (Internal quotation marks omitted, emphasis added.)

As the New York courts have articulated this same doctrine,

> [A] collateral parol agreement, being a separate, independent contract, although relating to the same subject matter as that of the contract in writing, is provable by parol evidence. . . . Oral collateral agreements are allowed to be

26

proved *because they are not a part of the written one*.

22 N.Y. Jur.2d, Evidence § 629 (Emphasis supplied). This Court's decision in *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499, 502-03 (2d Cir. 1970) incorporates that rule, holding that even an oral agreement may be enforced notwithstanding the existence of an integrated written contract on a related subject matter if the oral agreement: (1) is collateral; (2) does not contradict express or implied provisions of the written contract; and (3) is "one that parties would not ordinarily be expected to embody in the writing" and is not "so clearly connected with the principal transaction as to be part and parcel of it." (quoting *Mitchill v. Lath*, 247 N.Y. 377, 380-31 (1928). This release agreement (though largely *not* oral) met all three tests.

> ***i. First element – the collateral nature of the agreement.*** The trial evidence demonstrated clearly (and the jury was justified in finding) that from the very beginning Ng deliberately fashioned the release agreement to be collateral to – and independent of – the Separation Agreement. It was not included in the Separation Agreement for a very good reason – Edgcomb, a signatory to the Separation Agreement, was not to know about it. For that reason the November 16, 2007 e-mail that Ng wrote to Schram twice explicitly described the Release Agreement as a "separate"

agreement, and once as a "further" agreement. Schram accepted it on those terms.   The first  element is therefore satisfied.

   ***ii.   Second element – lack of contradiction.***  The second element is met because the release agreement did not modify or contradict the Separation Agreement as Ng now argues. It did not change the stated consideration for the guarantee in the Separation Agreement, which was a three-month deferral of any declaration of default.  Rather, it provided that the guarantee would be "*release[d]*" --  *i.e., "satisf[ied]"* (as Ng testified) -- upon the happening of a future event that was anticipated to occur within a few weeks.   The release agreement was a simple exchange of promises *dehors* the Separation Agreement: as consideration to Ng, Schram provided a temporary guarantee running to Ng's personal trust, which held a $5 million note; in return, Ng promised to release or "satisfy" that guarantee when his family company received $1.82 million (at which point Edgcomb's connections with the project would be severed), and that promise was the consideration running to Schram. (Schram Tr. 586, A-198) The release agreement was therefore not inconsistent with the Separation Agreement (a complex, multi-party contract) but actually served to accomplish its basic purpose, which was to separate Edgcomb and his entities from the resort. Once that had

occurred, the jury was entitled to find, the parties never intended the guarantee to have any further function. Ng himself confirmed that to the company auditors a few months later.

### iii. Third element – collateral agreement not expected to be part of the written contract. The release agreement also satisfies the third element because, as Ng's written offer made clear, the two contracting parties explicitly agreed it would *not* be embodied in the "universal" writing:

> [A] universal agreement [the Separation Agreement]…
> identifies the terms of the overall agreement to everyone
> (*except for the separate agreement between Steve
> Schram and the lenders*). I think this is important due to
> the nature in which this agreement was negotiated.

(Ex. 9, A-105) (emphasis supplied). Edgcomb was not to be informed of the release commitment because if he had known, in Ng's words, it might "have caused him to blow up … and affect the ongoing negotiations." (Ng Tr. 259, A-150) *Thus, Ng explicitly offered (and Schram agreed) not to incorporate in the Separation Agreement any mention of the bargained-for trigger mechanism for the later release of Schram's guarantee.* In other words, the release agreement was deliberately not integrated into the written contract.

As Schram and Congleton explained in their trial testimony, the

function of the guarantee was always as a "temporary step" -- to induce Edgcomb to sign the Separation Agreement and consummate his divorce from the project. Once the divorce was complete the guarantee was no longer called for. Without the release agreement, Schram (who had no cash invested in the resort) would clearly never have agreed to personally guarantee the entire $70 million in mortgage notes on the project – "underwater" obligations of an insolvent corporation.

### c. The Application of Wyoming's Parol Evidence Rule

At the root of the parol evidence rule is the concept that formal integrated written agreements have a certain sanctity, and that they should not be overturned or altered by extrinsic evidence of prior agreements *at variance* with the writing because those agreements are *presumed* to be integrated with the written contract and such evidence does not have the same indicia of reliability as the formal written word. Accepting such evidence would create "temptations to commit perjury," in the words of *Bushnell v. Elkins,* 245 P. 304, 306 (Wyo. 1926) which dealt with an alleged purely oral agreement at variance with the terms of a written promissory note. *See generally,* Williston on Contracts, *Parol Evidence Rule,* §§ 33:1-33:4 (4th Ed. updated May 2014); *Cordova v. Gosar,* 719 P.2d 625, 641 (Wyo. 1986), citing numerous cases as to the

"assumption that the written evidence is more accurate than human memory."

But here, the parties specifically agreed *not* to incorporate the release agreement in the Separation Agreement, conclusively rebutting the presumption in favor of integration. Williston states the relevant exception to the parol evidence rule as permitting parol evidence "[w]hen the writing is not a complete integration of the parties' agreement, and the oral agreement is intended to retain an independent collateral existence." *Williston on Contracts* § 33:2 (3) (4th Ed. updated May 2014)

Further, the jury found that the release agreement was not inconsistent with the guarantee – and there were no "temptations to commit perjury" and no question of faulty memories as to the contents of the Release Agreement because its essence was not oral at all. There is no question as to the authenticity of Ng's *written* release offer to release the guarantee: it was contained in an email from Ng whose contents were undisputed. And there is similarly no reliability issue as to Schram's acceptance: clearly, he *acted in reliance on Ng's offer* when he signed the Separation Agreement containing the guarantee. That act constituted

his acceptance, as the jury found, and he would never have committed that act had Ng not made that offer.[7]

Wyoming law amply supports the Court's charge and the submission to the jury of the factual questions of separateness and inconsistency. *Belden v. Thorkildsen, supra,* 156 P.3d 320 (Wyo. 2007) is right on point, as the District Court consistently held. In that case, Thorkildsen contracted in writing with Belden to buy 30% of a partnership business for $180,000. The partnership borrowed $180,000 to finance Thorkildsen's payment, and the two new partners signed a note to a bank (Belden doing so as an accommodation to Thorkildsen because the bank would not grant the loan otherwise). Belden's testimony was that Thorkildsen orally agreed to pay for his $180,000 interest by making the monthly payments on that note. When Thorkildsen was unable to do so, the partnership itself made the payments and recorded Thorkildsen's obligations on the partnership books as a receivable. Then Belden further agreed orally with Thorkildsen that his obligations to the partnership would be paid from future bonuses and commissions. The partnership

---

[7] To be sure, the term "parol evidence" can apply to extrinsic evidence of any agreement at variance with the terms of a fully integrated formal written contract, and therefore can go beyond unwritten evidence of merely oral agreements. Even so, the cases overwhelmingly deal with testimony about purely oral agreements, which presents the troublesome reliability issues on which so many of the decisions focus.

was later reorganized as an LLC, which gave a new note to the same bank and paid the balance due on the old partnership note with the proceeds. Thorkildsen never paid anybody. Belden eventually had to pay the LLC's note and sued Thorkildsen, who relied on the parol evidence rule to exclude evidence of his "side deal" with Belden, claiming it was inconsistent with the terms of the written promissory notes – which, of course, made no distinction between the co-obligors.

The Wyoming Supreme Court refused to let Thorkildsen wriggle out of his commitment to Belden in that fashion, holding that evidence of the two *oral* side agreements – *one of which was contemporaneous with the loan* – was admissible as an exception to the parol evidence rule since the evidence established a "separate and distinct contract," 156 P.3d at 324. That contract, obviously, was an oral agreement between Belden and Thorkildsen as to which of them (*inter se*) had the ultimate responsibility for the payments to the bank, even though both signed the notes. It was collateral to the notes, though related to the same subject matter.

Here too, the release agreement grew out of the same fact pattern as the Separation Agreement and was also a "separate and distinct contract" – not because Schram says so now but because Ng did at the

33

time, in writing and for good reason. His written offer twice used the words "separate agreement," and he explained why. As Schram testified, "He did not want Dick to know about it. He wanted this to be an agreement between himself and myself." (Schram Tr. 492, A-187; *accord,* Ng Tr. 259, A-150) In contrast, the significant parties to the broader "universal" Separation Agreement were the lenders, Edgcomb and DPS – and that agreement deals almost entirely (except for one sentence) with the mechanics of how their relationship was to be unwound. Indeed, the negotiations of the two agreements were separate: Ng deliberately excluded Edgcomb from discussions of the "temporary" nature of Schram's guarantee and did not inform Edgcomb about the release agreement – *i.e.,* that the guarantee would only be in force until Edgcomb made his payments for Lots 13 and 19. Edgcomb, seeing only the language of the Separation Agreement, was none the wiser. But, as in *Belden,* the parol evidence rule should not be used to enable Ng to wriggle out of the written "separate" and collateral commitment he undoubtedly made to Schram.

Finally, in discussing the dispositive *Belden* case, it is important to note that the agreements between Belden and Thorkildsen were entirely oral and not evidenced by any sort of writing. Thus, this precedent from

Wyoming's highest court stands for the proposition that even a completely oral side agreement (like any other oral contract) can be enforceable notwithstanding the parol evidence rule as long as it is separate and distinct from the written agreement and not inconsistent with it, though growing out of the same fact pattern. It seems plain, therefore, that the Wyoming courts would have no trouble with this much easier case. Here, the separateness of the agreements was explicit and the reasons why the release agreement had to be "separate" were clear. Here, moreover, the exchange of promises was not oral: the offer was an undisputed writing and the acceptance was in the form of an undisputed act through which Schram suffered a detriment.

Ng's brief concedes (at 28, n. 2) that evidence may be introduced about the discharge of a contractual obligation by virtue of an entirely oral agreement entered into *after* the execution of an integrated written contract (*Wright v. Krouskop,* 108 P.2d 262, 288). However, he argues (Br. at 3, 28-29) that the rule is different if the discharge agreement is "not in writing" and is *contemporaneous.*

- First, Ng consistently mischaracterizes the release agreement because its most important aspect – Ng's offer – *was* in writing.

35

- Second, none of the cases Ng cites for this proposition are from Wyoming.

- Third, Ng makes no effort to supply a reason why a contemporaneous discharge agreement that is specifically intended to be separate from the integrated writing should be treated differently from a subsequent one as a matter of law, and certainly no Wyoming case creates such a distinction. Ng concedes there are no Wyoming cases on this subject (Br. 29).[8]

- Fourth, none of Ng's cases deal with the situation presented here, where the contemporaneous agreement does not *immediately* release the financial obligation but rather provides that the release of that obligation *will occur on the happening of a described future event*. Conceding for the

_____

[8] As Ng grudgingly concedes (Br. at 21), the Wyoming rule excluding parol evidence of an agreement that varies or contradicts a writing "does not extend so far as to preclude the admission of extrinsic evidence to show a valid prior or contemporaneous collateral parol agreement between the parties, which is separate and distinct from, and independent of, the written instrument, has not been merged in, or superseded by, such instrument, and does not contradict, conflict with, or vary the express or implied provisions thereof or deal with a definite and particular subject matter which the written instrument expressly or impliedly undertakes to cover." *Lefforge v Rogers*, 419 P.2d 625, 627 (Wyo. 1966)

36

sake of argument that a judge or a trier of fact might find a contemporaneous release to be in conflict with the obligation itself, surely a contractual provision for a *future* release to "satisfy" the obligation with something other than full payment *recognizes* that obligation and is not "necessarily" inconsistent with it – and a reasonable jury could and did so find.

Finally, even assuming *arguendo* that the Wyoming case law supported Ng's argument *as applied to purely oral arrangements,* even that would not be dispositive. All of the cases that Ng relies on, without exception, deal with the exclusion of proffered testimony about oral contracts that were plainly inconsistent with, or varied, the written agreement. The jury reasonably found that there was no such inconsistency here. Further, most of Ng's cases speak of the classic dangers of oral testimony (miscommunications, failures of memory, self-interest and perjury) that provide the underpinnings of the parol evidence rule. But those classic dangers were simply not present in this case. Here the offer and acceptance were not only deliberately kept separate and distinct -- *they were not oral*. While there was oral testimony about the release agreement, that testimony merely provided the background of

the negotiations, context, the course of performance and corroboration – not the essence of the agreement itself.

At bottom, Ng's argument -- if accepted -- would require the exclusion from evidence of his own *written* offer of a "separate" agreement to release Schram's guarantee, as well as all the reasons he made that offer, as being inconsistent with the very guarantee obligations which his offer recognized and to which it specifically referred. That perverted result would be fundamentally inconsistent with the objectives of the parol evidence rule.

## Conclusion

Ng does not and cannot supply any reason why Schram would have been fool enough to sign a $70 million guarantee of the obligations of an insolvent company if the parties had ever intended that guarantee to be permanent. Ng's argument simply does not acknowledge that the guarantee here was always intended to be a "temporary step" (Exhibit 102), and that this required a release mechanism about which (as Ng conceded) he wished Edgcomb to remain ignorant. The release agreement explicitly recognized the guarantee obligation and provided for a "separate" mechanism to discharge or "satisfy" it. In so doing, it was not inconsistent with the written Separation Agreement between the

parties. Instead, it actually served to accomplish the primary purpose of that agreement, which was to remove Edgcomb from Snake River.

The judgment of the District Court should be affirmed.


Respectfully submitted.


D.F. MCGUIRE & ASSOCIATES, LLC


By    /s/  Harold F. McGuire, Jr.
        Harold F. McGuire, Jr., Esq.
        Daniel F. McGuire, Esq.
        777 Westchester Avenue, Suite 101
        White Plains, New York 10604
        Tel:  914.368.0016
        Fax: 914.368.0017
        hmcguire@dfmcguire.com
        dmcguire@dfmcguire.com
        *Attorneys for Defendant-Counter-
        Claimant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). This brief contains 8,266 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

D.F. MCGUIRE & ASSOCIATES, LLC

By    /s/   Harold F. McGuire, Jr.
       Harold F. McGuire, Jr., Esq.
       Daniel F. McGuire, Esq.
       777 Westchester Avenue, Suite 101
       White Plains, New York 10604
       Tel: 914.368.0016
       Fax: 914.368.0017
       hmcguire@dfmcguire.com
       dmcguire@dfmcguire.com
       *Attorneys for Defendant-Counter-*
       *Claimant-Appellee*